IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BETHANIE HALLAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-cv-00652-DGW |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Bethanie Hallam ("Claimant") applied for disability insurance benefits and supplemental security income on January 16, 2007 (Tr. 94). The Social Security Administration denied the application initially on March 13, 2007, and again upon reconsideration on June 5, 2007 (Tr. 51, 59). Claimant filed a timely written request for a hearing before an administrative law judge ("ALJ"), and the hearing was held on June 23, 2008 (Tr. 18-37, 61). By decision dated August 28, 2008, the ALJ found that Claimant was not entitled to disability insurance benefits as she was not disabled under The Social Security Act at any time from June 1, 2006 through the date of the decision (Tr. 16). Claimant's request for review by the Appeals Council was denied on June 25, 2009 (Tr. 1). Thus, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481; *Skarbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Claimant now seeks judicial review of the Agency's final decision pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the Claimant's petition is **DENIED**.

## BACKGROUND

### *Claimant's Application for Benefits*

Claimant was born on December 16, 1962 (Tr. 94). She was 44 years-old at the alleged onset-of-disability date of June 1, 2006. *Id.* Claimant has a high school education and worked

from 2001 to 2008 as a baby sitter, dental assistant, receptionist, secretary and substitute aid (Tr. 25, 126). Claimant alleged that her multiple sclerosis affected her ability to work as her right arm and leg were very weak and shaky, and prevented her from holding or lifting items on her right side (Tr. 125). She also alleged that she had a slight limp in her right leg and weakness in her right hand that caused numbness and tingling. *Id.* Claimant indicated that she stopped working full-time on June 1, 2006, but continued to work part-time from June 1, 2006 to April 28, 2008 (Tr. 24, 25). Claimant's date last insured is June 30, 2011 (Tr. 9).

### *Summary of Medical Records*

On August 8, 2006, Claimant visited Dr. Christopher Ballard for complaints of arthralgia in the left wrist, right shoulder and right elbow, and parethesias below the right knee to her foot. Claimant reported that her right leg felt "heavy" and complained that she "can't always use it appropriately." She did not have complaints of a sore throat, fever, chills, night sweats, headaches, diplopia, loss of vision, other parathesias, weakness or back pain. Dr. Ballard noted that Claimant's strength in her lower extremities was rated "5/5" and had some mild sensory deficit on the right knee to the ankle area (Tr. 279).

On August 11, 2006, Claimant underwent an MRI of the brain. The MRI revealed an active plaque formation in the left parietal region secondary to multiple sclerosis or a focal metastatic deposit. Dr. Ballard reviewed the MRI and noted "her ANA, sed rate and RF factors were all normal with a sed rate only noted as 1. Her CBC, TSH and CMP were completely normal." He reported that Claimant had experienced arthralgia, but noted that she had not been taking Celebrex as prescribed. Dr. Ballard's impression was that Claimant had parethesias in her right lower extremity over the shin with enhancing focus in the left parietal region and stated,

"this is concerning for the underlying multiple sclerosis. I don't know of any obvious primary so I think that metastatic disease is unlikely" (Tr. 271, 286).

On August 23, 2006, Claimant saw Dr. Barry Singer with complaints of right-sided weakness and numbness. Dr. Singer noted that in June 2006, Claimant noticed a gradual onset of numbness in her right hand extending up to her forearm, and within two weeks she had a gradual onset of numbness extending from her right hand to her right foot. He reviewed an MRI scan of the brain on August 11, 2006 and discovered a ring enhancing lesion in her left posterior frontal portion of her brain which suggested "possible dymyelination (sic), abscess, or tumor such as metastasis or glioblastoma." Dr. Singer recommended that Claimant go directly to the hospital for a diagnostic evaluation (Tr. 190-91).

Later that day, Claimant was admitted to the hospital. Upon admission, Claimant denied any focal weakness, but stated that she felt extremely weak for past two weeks. She indicated that she continued to have numbness in her right hand and lower arm for the past two weeks, but admitted that she did not limit the activity of her right hand and continued to write and do daily tasks with that hand. Claimant complained that her right leg felt weak and her balance was off, but denied dropping objects. She denied any facial numbness or facial droop, and she had not experienced any electric shock sensations down her spine. She also denied vision loss, double vision, hearing loss, ringing in her ears, and vertigo (Tr. 201-207, 224).

On August 24, 2006, an MRI of the cervical and thoracic spine revealed mild degenerative disease of the cervical spine and possibly mild myelitis at the C2-C4 and T-3 levels (Tr. 234).

On August 30, 2006, she returned to Dr. Ballard. An examination revealed that Claimant did not have edema or calf tenderness, but she did have sensory deficit in the right lower

extremity below the knee and the right upper extremity below the hand. Dr. Ballard noted that Claimant had "multiple sclerosis of new onset" and continued Claimant on 1 gram of Solu-Medrol IV daily for three days on an outpatient basis. Claimant was to follow-up with Dr. Singer to start Interferon injections on an outpatient basis (Tr. 280).

On September 6, 2006, Claimant returned to Dr. Singer. He noted that Claimant's right leg was stronger and the numbness in her right arm had improved (Tr. 219).

On October 19, 2006, Claimant had a visit with Dr. Elizabeth Sweet-Friend, a gynecologist. Dr. Sweet-Friend noted that Claimant had been diagnosed with relapsing remitting multiple sclerosis in September 2006. She reported that Claimant's right-sided symptoms had subsided since she had been taking Interferon injections (Tr. 277).

On November 17, 2006, Dr. Singer indicated that Claimant's right leg was strong, but became weak toward the end of the day due to fatigue. The record also states that Claimant's right hand and lower leg had good balance (Tr. 217).

On March 12, 2007, an agency physician, C.A. Gotway, evaluated Claimant's medical records and completed a Physical Residual Functional Capacity Assessment. The agency evaluator found, based upon the medical records, that Claimant could occasionally lift 50 pounds; frequently lift 25 pounds; stand or walk for a total of about six hours in an eight-hour work day; sit for a total of about six hours in an eight-hour workday; and perform unlimited pushing and/or pulling. Regarding postural limitations, Claimant could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch and crawl. No manipulative, visual or communicative limitations were established. Regarding environmental limitations, Claimant should avoid concentrated exposure to hazards such as

machinery and heights. The evaluator noted that there were no treating or examining source statements regarding the Claimant's physical capabilities in her file (Tr. 299-308).

On March 29, 2007, Claimant saw Dr. Ballard for complaints of increased weakness in her right upper hand with some mild parethesias. With respect to her physical limitations, Dr. Ballard noted that Claimant: 1) was still having weakness and her right leg and is unable to keep with her job at school as a personal assistant to a student; 2) was unable to lift any of the children and has not been able to work as much as she would like to; 3) was having difficulty typing, especially with her right hand, so she had been unable to perform her typing duties; 4) could not walk for prolonged periods of time or far distances due to weakness in the right leg which has been persistent; and 5) misses one day of work per week, and was taking Rebif injections every other day which causes her to have nausea, vomiting and headaches – which in turn, interferes with her ability to work. Dr. Ballard noted that Claimant's symptoms were exacerbated when she was playing golf, "they played three holes and was unable to go any further and had to be carried off." Claimant was about to take a weekend trip to Springfield, so Dr. Ballard instructed her to continue the Provigil- if that did not work he would set her up for outpatient IV-SoluMedrol 1 gram daily for three days (Tr. 276).

On June 4, 2007, Richard Bilinsky, an agency physician, reviewed the medical file and affirmed the March 12, 2007 Residual Functional Capacity Assessment (Tr. 308).

On August 7, 2007, Claimant saw Dr. Ballard for aching and weakness in her right arm and leg, and numbness in her tongue that had begun a week earlier. Dr. Ballard noted that Claimant's symptoms had already improved and diagnosed her as having experienced a multiple sclerosis flare with "right sided weakness typical with her usual flares." An exam revealed 3-4/5 strength in her right upper and lower extremities and 5/5 strength in her left upper and lower

extremities. Dr. Ballard noted that it had been one year since Claimant had IV Solu-Medrol, and prescribed a course of Solu-Medrol IV for three days (Tr. 330).

On August 17, 2007, Claimant returned to Dr. Ballard for a follow-up. Claimant had experienced a multiple sclerosis flare-up a couple of days prior to her appointment. Claimant still had weakness in her right lateral forearm and some paresthesias, but overall her hand had improved. She denied suffering from headaches, diplopia, chest pain, local parathesias, weakness and abdominal pain. Dr. Ballard reported that had a "moderately good response" to the prednisone despite the fact that she experienced significant side effects with it. He then commented, "[u]nfortunately she is still unable to work as this mainly involves her right upper extremity which is her dominant extremity. Affects her ability to concentrate causing significant fatigue, even on Provigil" (Tr. 328).

On August 24, 2007 Dr. Singer noted that Claimant was experiencing pain in her right forearm, right arm and right leg. Claimant had vision loss in her right eye, fatigue, bladder urgency, constipation and depression and balance off. Dr. Singer diagnosed her with multiple sclerosis exacerbation and noted that Claimant had "no face droop, sensory intact, mild difficulty with gait" (Tr. 320-321).

On September 4, 2007, plaintiff had a follow-up visit with Dr. Ballard. Claimant had previously experienced hypertensive side effects from the Solu-Medrol, but Dr. Ballard noted that the symptoms of her multiple sclerosis had improved, as had the side effects from the Solu-Medrol. Claimant's condition was stable and she was feeling "fine with no new complaints." Dr. Ballard noted that Claimant continued to have weakness in her right upper extremity, which he called "chronic" and stated, since it is "her dominant extremity" it "affects her ability to work" (Tr. 327).

On October 11, 2007, an MRI of the brain revealed a single focus of plaque formation in the left parietal occipital region which did not enhance with gadolinium. Radiologist Dr. Gerald Hanley opined that it was probably an old multiple sclerosis plaque (Tr. 310).

On November 12, 2007, Claimant was hospitalized for symptoms related to hypertension (Tr. 311). Dr. Alan Braverman noted that Claimant had a one year history of multiple sclerosis and had been seeing Dr. Singer for evaluation every two weeks. Five days later, Claimant had a follow-up with Dr. Ballard. He noted that Claimant's multiple sclerosis was stable (Tr. 324).

On January 4, 2008, Dr. Ballard completed a Physical Residual Functional Capacity Questionnaire wherein he diagnosed Claimant with multiple sclerosis exacerbated by stress and excessive heat, hypertension and fibromuscular dysplasia. He reported that Claimant suffered from muscle weakness, fatigue, inability to write clearly and inability to walk and carry items for prolonged periods of time. Dr. Ballard opined that Claimant was incapable of working in low-stress jobs because her symptoms would interfere with her ability to concentrate and focus on simple tasks. He stated that Claimant could not: sit for more than two hours at a time; stand for more than twenty minutes at a time; stand/walk for more than two hours in an eight-hour work day; and sit for more than six hours in an eight-hour work day. In addition, he found that Claimant would need to take as many as four to five unscheduled breaks per day, lasting about twenty to thirty minutes in duration, before returning to work. He indicated that Claimant could occasionally lift and carry up to ten pounds, twist, stoop (bend) and crouch/squat, but could rarely climb stairs and never climb ladders. Dr. Ballard opined that Claimant had significant limitations with reaching, handling and fingering, so much that she would likely miss more than four days of work per month due to her impairments (Tr. 337-340).

### Claimant's Activities of Daily Living Questionnaire

On February 9, 2008, Claimant completed an Activities of Daily Living Questionnaire. She indicated that the weakness in her right side, especially in her right hand, made it difficult for her to open twist lids on jars or food packages, use a pen, button clothing, carry bags of groceries and take out the trash. She also reported that she became fatigued easily and had weakness in her right leg, arm, and hand after she received injections. She experienced difficulty getting in and out of a car, driving a car long distances, getting out of the bed, getting in and out of the bathtub and climbing the steps. She indicated that she also had difficulty walking long distance, and at times, needed the support of another person. Claimant reported that she could not sit for more than two hours without having to move around. She stated that she could not complete a shopping trip at Wal-Mart without taking a break, but she was able to cooks meals without taking a break. She indicated that she had to take a one-hour break each day, and on the days she attended ballgames she was tired the next day. Claimant reported that she cleaned the house, made beds and prepared laundry one day per week, which left her right hand and leg tired and weak. She indicated that she was able to mow the lawn prior to August 2006, but had to stop because her right leg prevented her from operating the lawn mower. She also indicated that rode an exercise bike, however, the longer she rode the weaker her right leg became (Tr. 132-35).

### The ALJ Hearing

Claimant appeared for a hearing before ALJ Joseph Warzycki on June 23, 2008. Claimant was represented by Attorney Jeffrey Bunton. Ms. Young, a vocational expert was also present (Tr. 17).

Claimant testified that she stopped working in 2008 because her multiple sclerosis symptoms made her stiff and weak, and prevented her from getting out of bed on some days.

Claimant testified that she had such difficulty with day-to-day living that she did not believe that she could work a full-time job. She stated that she could not perform her past job as a receptionist because it required her to sit for eight hours per day, and her symptoms caused her to take breaks, move around frequently and occasionally take a nap throughout the work day. Additionally, Claimant testified her right hand became weak and caused her to have sloppy handwriting, and rendered her unable to type (Tr. 25-8).

Claimant testified that her daily schedule consisted of preparing breakfast, getting her children ready for school, watching television, watering her flowers, and fixing after-school snacks for her children. She testified that she often feels very fatigued, shaky and depressed. She stated that she is unable to perform simple tasks such as opening a can and picking up a milk jug or coffee pot. At times, Claimant is able to load and unload her dishwasher, do laundry, change bed linens, sweep, mop and shop for groceries. On the weekends, she takes her children to ball games and attends church services on Sundays. Claimant stated that she enjoys being outdoors when the weather is nice; however, the heat really bothers her and even prevents her from watching her daughters play softball (Tr. 28-33).

Claimant testified that she was taking Rebif, an interferon injection, three times per week and prednisone for inflammation. Claimant commented that the interferon injections produced flu-like symptoms (Tr. 31, 34).

Claimant testified that she was diagnosed with multiple sclerosis in August 2006. She stated that she first noticed symptoms in June 2006 while on vacation with her family. She experienced pain in her right elbow, which prevented her from opening jelly jars. Shortly thereafter, her right leg went limp during a shopping trip with her daughter. By the end of the

weekend, Claimant stated that she could not walk or get off of the couch. When she returned home, Claimant went to see Dr. Ballard, who then referred her to Dr. Singer (Tr. 35-36).

Claimant testified that although she has good and bad days, the areas from her elbow down to her hand, and from her knee down are always numb. At times she can cut meat, comb her hair and open a doorknob, but she can lift no more than 10 pounds with her dominant hand. She testified that she is limited to sitting for one hour at a time, walking no more than one mile and she does not tolerate walking up steps very well. Claimant stated that she can no longer stoop or sit down because it is very difficult for her to get up. Claimant testified that she has had high blood pressure for the past four years, but it is under control now (Tr. 37-41).

Mentally, Claimant stated that she had good and bad days. She testified that a psychologist or psychiatrist had previously prescribed pills to deal with her symptoms, but she stopped taking them because she wanted to fight the symptoms on her own. At times, she has difficulty concentrating and experiences crying spells and panic attacks. Claimant denied suffering from suicidal tendencies or hallucinations and has never been admitted to the hospital for a mental condition (Tr. 39).

At this point, Claimant's attorney, Mr. Bunton, took over questioning and redirected attention to the limitations of Claimant's activities. Claimant testified that she does not clean her house as often as she used to because it is difficult for her to vacuum, dust and make beds. She stated that her kids now have to assist her with the laundry and cooking. Claimant stated that she has crying spells once per week, lasting approximately thirty minutes. She testified that she has difficulty sleeping on the nights that she receives the interferon injections because she wakes up with discomfort, chills and shakes (Tr. 41-2).

Ms. Young, a vocational expert, also testified at the hearing. Ms. Young testified that she reviewed the exhibits in the case and was present for testimony at the hearing given by Claimant. She testified that Claimant's past work as a secretary and a receptionist was considered sedentary and semi-skilled. Claimant's past work as a childcare worker could be considered light or medium, semi-skilled work, depending on the size of the children involved. Claimant's past work as a dental assistant and teacher's aide are considered light, semi-skilled work. The ALJ asked Ms. Young to consider a hypothetical of a 45 year-old, with a high school education and with the same past work experience and limitations as Claimant. Ms. Young testified that such a person could perform Claimant's past relevant work as a receptionist or secretary. She also stated that Claimant could perform customer service and telemarketing work, both of which would be at the sedentary level. Mr. Bunton then asked Ms. Young to consider the Physical Residual Functional Capacity Questionnaire completed by Dr. Ballard on January 4, 2008, and determine whether Claimant would be able to perform her past relevant work or any other positions. Based upon the restrictions listed in Physical Residual Functional Capacity Questionnaire, Ms. Young stated that Claimant would not be able to perform her past positions or other work (Tr. 42-6).

### *The ALJ's Decision*

The ALJ rendered a decision denying benefits on August 28, 2008. The ALJ evaluated Claimant's application through step four of the sequential analysis and concluded that was not under a disability as defined in the Social Security Act from June 1, 2006 through the date of the decision (Tr. 9-16).

At step one, the ALJ found that Claimant did not engage in substantial gainful activity during the period of her alleged onset date of June 1, 2006, through her date last insured of June 30, 2011 (Tr. 11).

At step two, the ALJ found the Claimant to have the severe mental impairments of multiple sclerosis and hypertension. The ALJ further found that Claimant suffered from depression, but concluded that it was not a severe impairment (Tr. 11).

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Subpart P, Appendix 1. The ALJ considered Claimant's hearing testimony that her right side is very weak and shaky, she has difficulty holding or lifting things with her right hand, getting up after she has been sitting or stooping, and has developed depression with crying spells as a result of her physical limitations. The ALJ found that Claimant's subjective complaints regarding the intensity, persistence and limiting effects of the symptoms were not inconsistent with the medical evidence (Tr. 12-3).

The ALJ found the Claimant to have the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that she requires a sit/stand option for six hours out of an eight-hour workday and she can stand/walk for two hours out of an eight-hour workday. The ALJ also concluded that Claimant is limited to only occasional climbing, balancing, stooping, crouching, kneeling, crawling, no constant fingering with the dominant upper extremity and no concentrated exposure to moving machinery, unprotected heights, ladders, ropes and scaffolds. In coming to this conclusion, the ALJ must follow a two-step process in which he first determines whether there is an underlying medically determinable physical or mental impairment(s) and if so, he evaluates the intensity, persistence, and limiting

effects of the Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities (Tr. 10-2).

In evaluating the Claimant's RFC, the ALJ found Claimant's reports of impairments and her ability to work not credible due to the discrepancies between the Claimant's assertions and reports of the treating and examining physicians. He noted that the Activities of Daily Living Questionnaire completed by Claimant on February 9, 2008 to be consistent with her hearing testimony that she experiences significant limitations from weakness, fatigue and pain in her right side. Nonetheless, the ALJ noted that Claimant was still able to perform daily activities, such as use her dishwasher, do laundry, grocery shopping, use her right hand to button clothing, comb her hair, open door knobs and use eating utensils (Tr. 15).

He noted that Claimant's limitations were supported by the Third-Party Questionnaire completed by her sister-in-law. The ALJ, however, refused to rely on the statements of Claimant's sister-in-law as proof of Claimant's disability, as she was not a medical professional, and her opinions "were undoubtedly and understandably influenced by her familial affection for the claimant and a natural tendency to believe and support the claimant" (Tr. 15).

The ALJ also reviewed the opinion of the state agency physician in determining her RFC. The ALJ accepted the nonexertional limitations posed by Dr. Clement Gotway, but concluded that Claimant was more limited exertionally, and reduced her RFC to sedentary (Tr. 15).

The ALJ discounted Dr. Ballard's January 2008 Physical RFC Assessment of Claimant. The ALJ acknowledged that Claimant's impairments cause some limitations, and found Dr. Ballard's assessment of the severity of her limitations not to be supported by the medical evidence (Tr. 14).

At step four, the ALJ found that through the date last insured, Claimant was capable of performing her past relevant work as a receptionist and secretary pursuant to 20 C.F.R. § 404.1565. The ALJ considered testimony from vocational expert, Ms. Jones, who testified about Claimant's past relevant work history. Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ concluded that Claimant was able to perform these positions as generally performed. The ALJ considered the Dictionary of Occupational Titles as a framework for decision making. He also considered additional testimony from Ms. Jones who stated that Claimant could perform other positions, such as a customer service representative or telemarketer as these positions existed in significant numbers in the national economy (Tr. 16).

In conclusion, the ALJ found that Claimant was not disabled, as defined in the Social Security Act, at any time from June 1, 2006, through the date of his decision, August 28, 2008 (Tr. 16).

## DISCUSSION

### *Social Security Guidelines*

To receive disability benefits, a claimant must be "disabled." A disabled person is one whose physical or mental impairments result from anatomical, physiological, or psychological abnormalities which can be demonstrated by medically acceptable clinical and laboratory diagnostic techniques and which prevent the person from performing previous work and any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A), 1382c(a)(3)(B), 1382c(a)(3)(D).

The Social Security regulations provide for a five-step sequential inquiry for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The Commissioner must consider in sequence: (1) whether the claimant is currently employed and doing substantial

gainful activity, (2) whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments, (3) whether the impairment meets or equals one listed by the Commissioner and whether it meets the duration requirement, (4) whether the claimant has the residual functional capacity to return to doing his or her past work, and (5) whether the claimant is capable of making an adjustment to some other type of work available in the national economy. *Id.*

If the Commissioner finds that the claimant is disabled or not disabled at any step, she may make her determination without evaluating the remaining steps. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If there is an affirmative answer at either step three or step five, then there is a finding of disability. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At step three, if the impairment meets any of the severe impairments listed in the regulations, the impairment is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. app. 1, subpart P, part 404. However, if the impairment is not so listed, the Commissioner assesses the claimant's residual functional capacity, which in turn is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society under step five. 20 C.F.R. § 404.1520(e). The claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five. *Id.*

### Standard of Review

Under the Social Security Act, a court must sustain the Commissioner's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" of proof. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). *Richardson*, 402 U.S. at 401. The standard is satisfied by

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." An ALJ need not address every objective finding in the record for his judgment to be supported by substantial evidence. The ALJ "need only build a bridge from the evidence to his conclusion." *Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002) (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)). The Seventh Circuit urges "a commonsensical reading" of a claimant's medical history, "rather than nitpicking at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

Because the Commissioner is responsible for weighing the evidence, resolving conflicts in the evidence, and making independent findings of fact, this Court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Id.* However, the Court does not defer to conclusions of law, and if the Commissioner makes an error of law or a "serious mistake or omission," reversal is required unless the Court is satisfied that no reasonable trier if fact could have come to a different conclusion. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

### *Claimant's Arguments*

**A. The ALJ's Consideration of Medical Sources**

Claimant objects that the ALJ did not give controlling weight to the January 4, 2008 opinion of Claimant's treating physician, as set forth in the Physical Residual Capacity Questionnaire (Tr. 337-40). In that document, Dr Ballard opined that Claimant suffered from muscle weakness, fatigue, headaches, an inability to write clearly, an inability to walk, and an inability to carry objects for prolonged periods of time (Tr. 337). Additionally, Dr. Ballard indicated that Claimant was incapable of low-stress jobs because she did not have the requisite

attention and concentration needed to perform simple tasks (Tr. 338). Dr. Ballard opined that Claimant could not sit for more than two hours at a time; stand for more than 20 minutes at a time; stand/walk for more than two hours in an eight-hour work day; and sit for more than six hours in an eight-hour work day (Tr. 339-40). He also indicated that Claimant would require unscheduled breaks five times per day for twenty to thirty minutes, and would miss approximately four days of work per month. *Id.*

In making a disability determination, the ALJ will generally give more weight to the opinions of treating physicians, because of the benefit and perspective provided by a treating relationship, and will give them controlling weight if they are well supported by clinical medical evidence and consistent with other evidence in the record. 20 C.F.R. § 404.1529(d)(2); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). However, medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence in the record. *Clifford*, 227 F.3d at 870. When evidence in opposition to the presumption is introduced, the rule disappears and the treating physician's opinion is just one more piece of evidence that the ALJ must consider. *Hofslien*, 439 F.3d at 377.

Nonetheless, a claimant is not entitled to disability insurance benefits simply because his treating physician states that she is "unable to work" or disabled," *Clifford*, 227 F.3d at 870, the determination of disability is reserved to the Commissioner. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); 20 C.F.R. §§ 404.1527(d); 416.929(d). The Seventh Circuit has advised district courts to be mindful of the biases that a treating physician may bring to the disability evaluation. "The patient's regular physician may want to do a favor for a friend or client, and so the treating physician may too quickly find disability." *Dixon v. Massanari*, 270 F.3d 1171,

1177 (7th Cir. 2001) (citing *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)); see also

Hofslien, 439 F.3d at 377 ("the fact that claimant is the treating physician's patient also detracts

from the weight of that physician's testimony, since, as is well known, many physicians

(including those most likely to attract patients who are thinking of seeking disability benefits,"

and therefore "the weight properly to be given to testimony or other evidence of a treating

physician depends on the circumstances").  Regardless of the outcome, the decision of an ALJ

"must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight."  20

C.F.R. § 404.1527(d)(2); S.S.R. 96-8p.

The ALJ found that Claimant could perform a limited range of sedentary work (Tr. 12).

In reaching this conclusion, the ALJ considered the objective medical evidence, as well as the

opinions of Dr. Ballard and the state agency physicians (Tr. 12-15).  The ALJ noted that

Claimant had relatively few multiple sclerosis exacerbations, and pointed to three instances

where Claimant experienced "flare-ups."  The first episode occurred in August 2006 when

Claimant was first diagnosed with multiple sclerosis (Tr. 13).  The second episode occurred in

March 2007 when Claimant was playing golf, and the third episode occurred in August 2007.  *Id.*

The ALJ noted that the flare-ups were treated with medication and Claimant's symptoms

subsided within days.  *Id.*

In evaluating Claimant's ability to work, the ALJ considered RFC assessments by Drs.

Gotway and Billinksy, the state agency physicians (Tr. 15).  Their assessments limited Claimant

to medium work with no climbing of ramps, stairs, ladders, ropes, scaffolds and no exposure to

hazards such as machinery and heights.  The ALJ rejected the opinions of the state agency

physicians, finding Claimant to be more limited, and accordingly reduced her RFC to sedentary. *Id.*

The ALJ also relied upon a portion of Dr. Ballard's January 4, 2008 RFC assessment in determining that Claimant was limited to sedentary work. Just as Dr. Ballard opined, the ALJ concluded that Claimant requires a sit/stand option for six hours out of an eight-hour work day, and she can stand/walk for two hours of an eight-hour work day (Tr. 12).

The ALJ, however, discounted portions of Dr. Ballard's assessment and found them "not entirely credible" (Tr. 14). With respect to Claimant's physical limitations, the ALJ remarked that the medical evidence did not support Dr. Ballard's opinion that her impairments render her unable to walk. *Id.* The ALJ pointed to medical records indicating that Claimant's gait was only mildly impaired, she did not need the assistance of a cane or other walking device, and she was not prohibited from attending church, sporting events, functions at her children's schools and grocery shopping. *Id.* Furthermore, the ALJ noted that the medical records demonstrated that Claimant only had mild weakness in her right upper extremity and mild pressure headaches, rather than migraines. *Id.* The ALJ pointed to Claimant's hearing testimony where she stated that she could lift at least ten pounds with her right hand. The ALJ remarked that it was significant that Dr. Ballard listed Claimant's prognosis as "fair with slow progression and exacerbations" though the medical evidence demonstrates that her exacerbations have been relatively infrequent. *Id.*

Regarding Claimant's mental limitations, Dr. Ballard indicated that her concentration would be diminished to the point of being unable to perform simple tasks, the ALJ pointed out that Claimant indicated in the Activities of Daily Living Questionnaire and at the hearing, she is still able to grocery shop and watch soap operas on television (Tr. 14). The ALJ pointed out that

the record demonstrates that Claimant's abilities to think, understand, communicate, concentrate, get along with other people, and handle normal work stress were not significantly impaired on any documented long-term basis. *Id.* In coming to that conclusion, the ALJ pointed out that Claimant was able to work at least one year as a teacher's aide after the date of her alleged onset date, taken with her other activities, is evidence that Claimant's concentration was not so impaired as to preclude her past work. Furthermore, Claimant testified that she stopped working because of her physical impairments, and not due to concentration deficits.

Contrary to Claimant's argument, the ALJ thoroughly discussed the medical evidence in making his decision, and did not, as the Claimant suggests, play doctor. The Court finds that the ALJ built the requisite bridge from the evidence to his conclusion. Thus, the Court concludes that the ALJ's conclusion regarding Dr. Ballard's January 4, 2008 medical opinion is based upon substantial evidence on the record as a whole.

### B. Credibility of Statements Made by Claimant's Sister-in-Law

Claimant further contends that the ALJ did not properly consider the credibility of her sister-in-law's statement regarding Claimant's ability to work full-time. On April 30, 2007, Claimant's sister-in-law, Lynda Wallace, submitted a third-party function report in support of Claimant's disability claim (Tr. 167-174). Claimant alleges that the ALJ erred by failing to use the guidelines set out in Social Security Ruling ("SSR") 06-03p, section I, entitled "Explanation of the Consideration Given to Opinions from 'Other Sources." Claimant's reliance on SSR 06-03p is misplaced because "other sources" as defined in that section refers to medical sources who are no "acceptable medical sources" and "non-medical sources" who have seen the individual in their professional capacity. The third-party witness at issue in this case is Claimant's sister-in-law, who does not qualify as "other sources" pursuant to SSR 06-03p.

The ALJ considered the statements of Claimant's sister-in-law but found that they were not proof of her disability (Tr. 15). Although he viewed the statement as sincere, he discounted the statement because Claimant's sister-in-law is not medically trained, and therefore, did not have the expertise to determine whether Claimant is capable of working. *Id.* The ALJ noted that Claimant's sister-in-law had motivation, as a family member, to assist Claimant in obtaining benefits. *Id.* The ALJ further remarked that the sister-in-law's statements essentially corroborated Claimant's subjective complaints, which he found were inconsistent with the evidence of the case. *Id.*

Given Claimant's testimony about her limited abilities, the statement from her sister-in-law does not constitute a separate line of evidence, but rather serves to reiterate and thereby corroborate Claimant's testimony. *Books v. Chater,* 91 F.3d 972, 980 (7th Cir.1996); *see also Briscoe ex rel Taylor v. Barnhart,* 425 F.3d 345, 354 (7th Cir.2005); *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993). Therefore, to the extent that the ALJ found Claimant's testimony not credible, he necessarily found the third-party statement unconvincing. *Books,* 91 F.3d at 980. Accordingly, the ALJ did not err by failing to give greater weight to the statement of Claimant's sister-in-law.

## CONCLUSION

Based upon the foregoing, the Court finds that the ALJ's decision that Claimant Bethanie Hallam was not disabled was supported by substantial evidence on the record as a whole. Therefore, Claimant's petition is **DENIED**.

**DATED: March 29, 2011**

**DONALD G. WILKERSON**
**United States Magistrate Judge**